**James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellant,**

v.

**BEKINS VAN & STORAGE COMPANY, a Corporation, Appellee.**

**No. 14618.**

United States Court of Appeals
Ninth Circuit.

March 1, 1956.

---

Stuart Rothman, Sol., Bessie Margolin, Asst. Sol., Sylvia S. Ellison, Eugene R. Jackson, Attys., Dept. of Labor, Washington, D. C., Kenneth C. Robertson, Regional Atty., Dept. of Labor, San Francisco, Cal., for petitioner.

Lucien Shaw, William French Smith, Gibson, Dunn & Crutcher, Los Angeles, Cal., for appellee.

Before STEPHENS, FEE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Bekins pays its employees at its Alameda warehouse in downtown Los Angeles on a basis of 48 hours per week without overtime for work in excess of 40 hours per week. The Secretary of Labor says this is wrong and seeks overtime pay for the employees at this one warehouse because of its high percentage of interstate business at this one place considered alone. Bekins replies that the Alameda warehouse is one of five scattered warehouses in downtown Los Angeles which it operates as a unit known as the East Los Angeles Division. If the one warehouse classifies as an "establishment," the Secretary of Labor is right.[1] If the "establishment" is Bekins unit of five warehouses, he is wrong, because more than half of the total business of the five warehouses is local, intrastate, a service, and possibly retail.

The district court ruled in favor of Bekins and the secretary has appealed.

For a full understanding of the case, one should read the findings of fact and conclusions of law of the district court which are hereinafter set forth as an appendix to this opinion.

For reversal, the secretary relies principally upon Phillips, Inc., v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095. That was the case of overtime pay for the warehouse employees in one warehouse which received groceries in interstate commerce and distributed them to some of the company's chain stores in Massachusetts and Connecticut. The wage provisions of the Federal Fair Labor Standards Act were held to be applicable and the employees not within any exception.

Naturally, if the Phillips case is apposite, this court must follow it. But,

[1] The section involved, 29 U.S.C.A. § 213, so far as pertinent, reads as follows:
"§ 213. Exemptions
"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to * * * (2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located."

to this court, (and it may be oversimplification to say so) it seems that the rationale of the Phillips case lies in the fact that the warehouse function historically had been that of independent wholesalers or wholesalers independent of retail grocers. The impact of the act was not to be avoided by setting up of an "integration" of wholesale and retail functions. Phillips warehousemen should have the same protection the warehousemen have in warehouses not integrated with the retail selling operation.

This court does not believe Phillips to be necessarily controlling and affirms the trial court. If Phillips holds that if a business is in separate buildings, each building is necessarily an establishment then, of course, this court is wrong. It hardly seems though that Phillips goes that far.

Here the defendant's pattern of business with central control at one of the area warehouses existed before the adoption of the act. No one suggests that Bekins has adjusted its business to try to get around the act. The unit of operation of Bekins seems to be the "division." Doubtless, the secretary would not take the position he does here if the buildings were side by side, although separate. It does not seem unreasonable to consider the five warehouses, generally in downtown Los Angeles within a limited radius, as one establishment.

Geography may well play quite a role. Probably, if the buildings were to be found scattered in San Diego, Los Angeles, Long Beach, Pasadena, Santa Barbara, Bakersfield, San Bernardino, and Riverside (with central control at one office) the trial court's conclusions would be clearly erroneous.

To this court, an important factor here is that if it were not for financial or capital problems and the necessity of using what one has, it would be quite feasible to conduct, and Bekins probably would conduct, the business of the five warehouses in one central warehouse under one roof.

This court believes that, although there is no real dispute on facts, the trial court still was entitled to appraise the facts and make a determination as to which facts really pointed to "one establishment" and which pointed to "separate establishments."

The decision here is simply that it is possible for one business located in several buildings, neither contiguous nor widely scattered, to be one establishment and that the proprietor's unit of operation and control may be considered, in a case like this one, in determining what is an establishment.

Here the trial court found one establishment. The proprietor's historical unit of operation and control were considered. His natural business policy was given weight by the trial court. However, these factors were not used mechanically or given conducive force. These were some of the shadings in a problem of fact.

This court does not join the district court in chiding the Secretary of Labor for bringing the action when the individuals concerned are members of a strong union, the Teamsters, presumably able to protect the men. Bekins and the Teamsters cannot get together and set aside the positive policy of the act.

Affirmed.

### Appendix.

Findings of fact and conclusions of law of district court.

### "Findings of Fact

"(1) Plaintiff does not contend that any of defendant's warehouses either in the East Los Angeles Division or elsewhere fail to meet the tests of exemption as a retail or service establishment within the meaning of Section 13(a) (2) of the Fair Labor Standards Act, as amended, except only the Alameda warehouse. [22]

"(2) The East Los Angeles Division of defendant, including Alameda, is a single establishment within the meaning of section 13(a) (2) of the Fair Labor

Standards Act (29 U.S.C., sec. 213(a) (2)), the business activities of which are to be considered together as a unit, and as such an establishment, more than 50 percentum of its annual dollar volume of sales of goods or services is made within the state in which it is located and 75 percentum of its annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry. Such tests are not met in the case of the Alameda warehouse considered separately.

"(3) All of the employees of defendant's East Los Angeles Division, including those at Alameda, are employed by a retail or service establishment which qualifies with the requirements of section 13(a) (2) of the Fair Labor Standards Act (29 U.S.C., sec. 213(a) (2).

"(4) Defendant is, and has been since 1950, and long prior thereto, a California corporation, having its principal office and place of business located at 1335 South Figueroa Street, Los Angeles, California. The business of defendant includes the moving and storage of household goods, the moving of used office equipment and furniture, the moving of complete offices, stores and commercial and industrial operations, rug cleaning, fur storage, rental of office and building space and storage of commercial goods. Defendant owns approximately 20 per cent of the stock of Bekins Van Lines Co., which is a motor common carrier of household goods throughout the United States.

"(5) Defendant operates 36 warehouses which are grouped in 19 divisions or districts in various cities within the State of California, and at each warehouse employees are regularly engaged in the storage, cartage, packing and shipping of household goods, and each is used as a terminal point for the moving by motor van of household goods both locally and for long distances. All of said warehouses except one regularly engage in the receiving, storing and delivery of commercial goods. Ten of them have railroad sidings. Substantial quantities of the goods handled, packed and stored by defendant at its various warehouses have been, and are being, received from points in other states and outside the United States and have been, and are being, handled, packed, shipped, delivered, transported, and offered for transportation to points in other states and outside the United States.

"(6) The business of defendant was commenced in 1895 in Los Angeles, California. Thereafter, the company grew and expanded principally with respect to moving and storage of household goods until in 1945 it was operating moving and storage warehouse businesses with warehouses in the principal cities in the State of California.

"(7) In 1946 and thereafter until the present time, defendant continued rapid expansion and growth of its business and facilities. It built approximately twenty new warehouses or warehouse additions during that period in many cities in California. It attempted to provide warehouse facilities by new construction to serve rapidly growing and expanding residence neighborhoods.

"(8) In connection with its expansion from its beginning until the present time, it has been the policy of defendant to decentralize its management to the maximum extent possible. It is defendant's belief that moving and storage service can best be provided at its numerous warehouses through a local organization at the various locations which has full responsibility for all phases of the service provided. Defendant has therefore divided its warehouses into 19 divisions or districts, each of which has a district manager in charge who is responsible for all of its operations. In the Los Angeles [24] area, defendant has such district offices in its East Los Angeles Division, its Hollywood District, Beverly Hills District, Compton-Lynwood District, Glendale District, Wilmington District, which includes Hermosa and Redondo; Inglewood District, Long Beach District, San Fernando Valley District, Pasadena District,

Santa Ana District and Santa Monica District. The management of defendant believes in, and has adopted, adequate and thorough record keeping and control systems to measure the performance and success of its various district offices.

"(9) Originally in defendant's operations in the Los Angeles metropolitan area, it was organized with a West Los Angeles Division and an East Los Angeles Division. The West Los Angeles Division included Hollywood, West Hollywood, Beverly Hills and Santa Monica, and the East Los Angeles Division included the warehouses at Alameda, Figueroa, Crenshaw, Wilshire and Grand Avenue which still are included in the East Los Angeles Division. Prior to 1946, following defendant's policy of decentralization, the West Los Angeles Division was divided into the Hollywood, Beverly Hills, and Santa Monica districts with separate district managers at each one. In 1946 and again in 1950, the executive management of defendant gave thorough consideration to the dividing into smaller units of the East Los Angeles Division and after considering the facts decided that it was not practical nor feasible to divide the East Los Angeles Division consisting of five warehouses into smaller units.

"(10) Defendant's East Los Angeles Division consists of five warehouses in the central part of the city of Los Angeles. The photographs in plaintiff's Exhibit 1 are reasonable representations of the exteriors of the five warehouses in the East Los Angeles Division. The main office and one warehouse of this division is at 1335 South Figueroa Street, herein called "Figueroa." The other warehouses are located at [25] 3625 South Grand Avenue (herein called "Grand Avenue"), 4174 West Pico Street (herein called "Crenshaw"), 116–122 South Western Avenue (herein called "Wilshire"), and Fourth and Alameda Street (herein called "Alameda"). The Alameda Warehouse is approximately 1¾ miles from Figueroa, and the others are from 1.8 to 3.5 from Fig-

ueroa. Defendant's general office for the entire business is located at Figueroa. Plaintiff's Exhibit 2 is a map of the city of Los Angeles showing the locations marked with red pencil of the five warehouses in the East Los Angeles Division.

"(11) Each of the warehouses included in the East Los Angeles Division contains warehouse space, loading docks, packing equipment and yard area for the servicing and operation of household goods motor vans, as well as for accommodating motor trucks. The Alameda and Grand Avenue warehouses are equipped with a railroad siding. Upon plaintiff's Exhibit 2 is marked in blue pencil the approximate area which has been officially designated by defendant as the territory to be served by the East Los Angeles Division to the exclusion of defendant's other districts in the Los Angeles metropolitan area. The East Los Angeles Division is responsible for providing moving and storage and other services in this territory but this territory is not further subdivided or broken down as to services to be rendered by any particular warehouse within the East Los Angeles Division.

"(12) Defendant has numerous employees working for its East Los Angeles Division and rendering services of the type herein described. Eleven of these employees work at the Alameda warehouse of defendant. Of said 11 employees, 8 work hours in many work weeks in excess of 40 hours and less than 48 hours but do not receive overtime compensation for such hours worked in excess of 40 hours. Of the remaining 3 employees at Alameda, [26] one is specifically exempted from Section 6 and 7 of the Fair Labor Standards Act [29 U.S.C.A. §§ 206, 207] by section 13(a) (1) thereof, as a bona fide executive employee, and two are office workers who are paid by defendant by the hour and regularly work 48 hours per week with time-and-one-half pay for hours in excess of 40 per week.

"(13) The Alameda warehouse is a five-story reinforced concrete building of

approximately 60,000 square feet consisting of office space about 15 x 30 feet, truck and van loading docks, railway loading docks, and five storage areas. There are two office employees at Alameda whose duties generally consist of the following: preparing documents used in connection with receipt and delivery of storage lots, maintaining stock cards on commercial storage, answering the telephone, figuring storage rates, preparing warehouse receipts and carrying on other comparable clerical work. There is one warehouse foreman at Alameda whose duties generally consist of the following: physically handling and moving stored goods, checking stored goods in and out of the warehouse, supervising other warehouse employees, opening and closing the building, carrying on fire prevention measures, supervising and working on loading and unloading of freight cars, reporting incompetent work to supervisors, selecting locations in the warehouse for storing goods, and performing minor clerical work in connection with receipt and delivery of stored goods.

"(14) Defendant, since January 1, 1950, with respect to all of its employees working in the East Los Angeles Division, including those working at Alameda, has maintained records with respect to such employees of their names, home addresses, occupations and place or places of employment, and has maintained with respect to such employees daily and semi-monthly records of hours worked. Defendant has not, with respect to such employees, maintained records of hours worked in each week or wages paid on a weekly basis. [27]

"(15) Defendant's Alameda warehouse was built on property acquired in 1898 and was constructed shortly thereafter, and at that time was in the center of a prosperous residence area in the city of Los Angeles. Defendant's Figueroa warehouse was constructed on property acquired in 1907, and portions of the same were built between then and 1913, and at such time, Figueroa was adjacent to the leading residence area

in Los Angeles which was then along South Figueroa Street. The Crenshaw warehouse was built in approximately 1927 to serve the new residence areas in its area, particularly the Leimert Park area. The Wilshire warehouse was owned by the Wilshire Fireproof Storage Company in which defendant acquired a controlling interest in 1931, and from that time until the present, leased said warehouse from said controlled company. The Wilshire warehouse at the time of its acquisition served the prosperous Wilshire residence area. The Grand Avenue warehouse was acquired in 1942 to meet unusual requirements for space for storage of household goods resulting from World War II.

"(16) After acquisition of the Alameda warehouse, the surrounding area changed greatly until at the present time it consists entirely of a heavy industrial and commercial neighborhood. The Figueroa warehouse is no longer adjacent to the finest residence area in the city of Los Angeles but has gradually changed to a commercial area with a heavy predominance of automobile dealers and boarding houses. The Crenshaw warehouse is still in the vicinity of substantial residence areas, but their character has deteriorated somewhat. The Wilshire warehouse is no longer adjacent to the finest residence area in Los Angeles, which has moved to other locations, but is still in the center of a substantial residence area. The character of the area surrounding the Grand Avenue warehouse has not changed greatly since its acquisition by defendant. Because of [28] the changing conditions pertaining to the areas surrounding the warehouses in the East Los Angeles Division, defendant has changed the character of its business in that division. It now handles some commercial storage at each of these warehouses, although it still handles large amounts of household goods at all of them. It engages in larger moving jobs than formerly, some of them for enterprises such as law firms, hardware companies

and commercial operations, which require large amounts of manpower and great flexibility in shifting employees from one job to another. Defendant has developed a record storage business at its Figueroa warehouse and leases substantial portions of its Crenshaw and Wilshire warehouses to a furniture dealer for the sale of furniture. Defendant has attempted to adjust its business in the East Los Angeles Division to meet changing conditions and has done so successfully, but could carry on the operations there as well or better if all of its business were carried on in a single large building instead of five buildings geographically separated.

"(17) All of the management, executive and administrative functions of the East Los Angeles Division are performed by individuals whose principal office and location is at Figueroa and who give direct orders to and supervise the employees at all five warehouses in the East Los Angeles Division. These individuals make daily visits to each of the warehouses in the division. They include a manager, an assistant manager, a superintendent, an accountant, a dispatcher, a sales manager and a storage manager. Each of these individuals performs his duties in his respective field for the entire East Los Angeles Division. Together they are responsible for the success of the entire East Los Angeles Division and are responsible for the success of the operations of the Division as a whole. No one is responsible only for the success of Alameda or any one of [29] the other warehouses in the East Los Angeles Division.

"(18) Defendant's East Los Angeles Division maintains moving van equipment at each of the five warehouses in the Division but all of the dispatching of all of them on all moving orders is handled by the dispatching office at the Figueroa main office of the Division, either by personal orders or by telephone orders.

"(19) All of the sales activities of defendant are conducted from the Figueroa warehouse. Defendant has an active sales program which includes 7 salesmen for the East Los Angeles Division who are expected to and do carry on sales efforts and work in individual territories within the territory of the Division which are assigned to them. The territories assigned to the respective salesmen are assigned without relation to the location of the warehouses of the Division but the territories are assigned on the basis of approximately equal sales potential in each such territory.

"(20) Eighty per cent of the customers of the East Los Angeles Division who deal with it either in person or by telephone do so at or to its Figueroa office. Defendant runs newspaper advertisements advertising its services in which the only phone number of the East Los Angeles Division listed is the telephone number at Figueroa.

"(21) The working force at the East Los Angeles Division is largely interchangeable among the various operating tasks: Most of the drivers are competent as packers and craters and most of the packers and craters are competent as drivers or helpers on moving jobs. These employees are frequently shifted back and forth from one warehouse to another within the East Los Angeles Division; for example, one or more employees are shifted to Alameda on an average of one day per week and one or more employees are shifted from Alameda to another warehouse in the East [30] Los Angeles Division on an average of two days per week.

"(22) The accounting records for defendant's East Los Angeles Division are maintained at the Figueroa office as a single system of accounts and records. The East Los Angeles Division accounting system is the same as that used by defendant for its other districts. If defendant maintained a separate system of accounting records for each warehouse within the East Los Angeles Division, the cost would be more than 100% greater than at present if the system were maintained at each warehouse, and more than 50% greater if

the separate records were all maintained at the Figueroa warehouse. No separate accounting records are maintained for the individual warehouses in the East Los Angeles Division because of this greatly increased cost of doing so and because the management has no requirement or need for separate accounting information for each warehouse within the East Los Angeles Division.

"(23) The accounting office of the East Los Angeles Division prepares periodic financial statements including profit and loss statements and balance sheets for the Division as a whole and these are not broken down or classified in any manner for the respective warehouses located within the East Los Angeles Division including Alameda. No financial statement or profit and loss statements are separately prepared or maintained by defendant for Alameda.

"(24) A single set of bank accounts is maintained by defendant for the entire East Los Angeles Division, and all financial transactions, without segregation for the entire Division are handled through said bank accounts. No bank accounts are maintained separately for Alameda. Payroll records are not handled separately for Alameda but are maintained at the Figueroa office as a part of the payroll records for the entire Division.

"(25) Defendant purchases in large lots, the following supplies, which after their purchase are stored in one or another of its warehouses until needed, for use of all of its warehouses in the Los Angeles metropolitan area; naphthalen flakes, kraft paper, and towels. All other supplies for the East Los Angeles Division are purchased by the Division in large lots for the use of the entire Division, including the following: boxes, barrels, shredded paper, paper pads, corrugated paper, tissue paper, small tools, office supplies, office furniture and fixtures, business machines, and typewriters. No supplies or materials are purchased by defendant separately for the needs or requirements of Alameda

alone. The East Los Angeles Division operates a repair and maintenance shop at Figueroa for all of the automotive equipment which it operates from all warehouses in the Division, and maintains there a single inventory of automotive parts and supplies for the use of the shop.

"(26) It would not be practical, economic or good business practice for defendant to divide its East Los Angeles Division into smaller management, administrative or operating units because (a) the cost of doing so would be much greater than the present costs, (b) the present single administration, management and operation permit much greater flexibility which is required for the kind of business done by the East Los Angeles Division, and (c) the type of work being handled by defendant requires the present method of management, administration and operation.

"(27) All of the employees of defendant working at Alameda are members of a single Local (No. 389) of the International Brotherhood of Teamsters Union, which local includes, without segregation, all of the union employees of the defendant working for its East Los Angeles Division and other divisions in the Los Angeles metropolitan area. A single labor union contract uniformly applies to all of the employees of defendant in [32] its warehouses in the Los Angeles metropolitan area including the East Los Angeles Division. The union contract applicable to all the employees of the East Los Angeles Division provides that the normal work week is 48 hours in 6 days, Monday through Saturday, and provides for no payment of overtime during such work week but does provide for overtime for work in excess of 8 hours in any one day. The contract provides that in the event of any change in this work week, the contract shall be considered open for negotiations regarding wages and hours. The International Brotherhood of Teamsters Union is one of the most powerful unions in the United States. Its representatives are familiar with and keep

in close touch with the business and operating problems of the employers of its members including defendant.

"(28) If defendant were forced to pay overtime to operating employees at its Alameda warehouse for work between 40 and 48 hours per week, this would upset prevailing wage patterns of defendant and create wage inequities between groups of its employees, which, in turn, would have a very serious adverse effect upon the relations of defendant with its employees and upon their morale.

"(29) Defendant handles a substantially greater volume of business at its East Los Angeles Division on Saturdays than on any other day in the week and this is a convenience to the public. If defendant were required to pay overtime for work in excess of 40 hours per week and less than 48 hours in such week, defendant would have to increase its rates and the volume of its business on Saturdays would be substantially decreased. The public has an alternative to the use of defendant's services for the moving of household goods, through the use of trailers and rental trucks. Defendant would not be able to close its Alameda warehouse after its employees there had worked in excess of 40 [33] hours in one work week because the defendant's contract with the International Brotherhood of Teamsters Union provides for a normal work week of 48 hours, Monday through Saturday, and provides for re-opening the contract in the event of a change.

"From the foregoing Findings of Fact, the Court makes the following:

Conclusions of Law

"(1) The Court concludes in all respects as set forth in the foregoing Findings of Fact and any Conclusion of Law that is contained therein is hereby expressly incorporated in these Conclusions of Law with the same force and effect as though expressly set forth therein.

"(2) Defendant's East Los Angeles Division is a single establishment within the meaning of section 13(a) (2) of the Fair Labor Standards Act (29 U.S.C., sec. 213(a) (2) and its Alameda warehouse is not alone a single establishment within the meaning of said section.

"(3) All of the employees of defendant at its Alameda warehouse are employed by a retail or service establishment as defined in section 13(a) (2) of the Fair Labor Standards Act (29 U.S.C., sec. 213(a) (2) and therefore are exempt from the requirements of sections 6 and 7 of said Act (29 U.S.C., sec. 206 and 207)."