Cyril WESSLING, Plaintiff,

v.

CARROLL GAS COMPANY, Division of
Northern Propane Gas Company,
Carroll, Iowa, Defendant.

Civ. No. 65–C–2007–C.

United States District Court
N. D. Iowa, C. D.

March 1, 1967.

Russell Wunschel, Carroll, Iowa, for plaintiff.

Mark McCormick, Fort Dodge, Iowa, for defendant.

## MEMORANDUM AND ORDER

HANSON, District Judge.

This action was commenced by Cyril Wessling against Carroll Gas Company, Division of Northern Propane Gas Company, Carroll, Iowa, claiming overtime pay by virtue of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., for the years 1962, 1963, and 1964.

Carroll Gas Company is a division of Northern Propane Gas Company, a Delaware corporation. It existed as an independent corporation until 1962 when it was dissolved and bought by Northern Propane. Carroll Gas Company was owned by Northern Propane during the time in question. It engages in the retail sale of propane gas in bottles and in bulk.[1] Its sales during the years in question included retail sales of appliances. About 50% of the appliances received at Carroll were sold there. A relatively small proportion of its total sales volume was attributable to wholesale sales of propane gas and appliances. No appliances were sold for resale in 1964.

Carroll Gas Company has two back rooms which were utilized as storage space for shipments of appliances received from out of state. These shipments came by rail and by truck. A stipulation entered into by the parties shows that four shipments were unloaded in 1962, four were unloaded in 1963, and three were unloaded in 1964. Each shipment had an approximate value of four or five thousand dollars.

Carroll Gas Company served as a distribution point for appliances to other Northern Propane affiliates in the surrounding area. Carroll Gas Company was more centrally located in relation to the other districts. The appliances going to other dealers were transferred out by truck usually, although some were delivered by Carroll Gas Company to a few locations including Fort Dodge, Iowa.

Generally, the appliances were removed from the Carroll Gas Company premises shortly after their arrival. Sometimes, however, they were not picked up right away. On several occasions appliances were shipped out of state.

Plaintiff Wessling was primarily employed in the capacity of "cylinder driver" during the years in question. As a "cylinder driver," he delivered full propane bottles, picked up the empties, and got them refilled. He also had other duties including helping to deliver bulk gas which came to Carroll from out of state and he aided in shifting and loading appliances. The stipulation shows that he helped unload appliances four times in 1962, four times in 1963, and once in 1964. He testified that he assisted in loading "at least every week."

Two letters from the Regional Director of the Department of Labor in response to inquiries made by Mr. Dean W. Wallace, head counsel for Northern Propane, were introduced into evidence. They show that defendant's Carroll Gas Division was found to be within the Act's coverage and its employees were not exempt. The Company agreed to comply in the future but refused to pay back wages.

One principal question is presented in this litigation: Was Carroll Gas Company during the years in dispute an exempt retail establishment under Title 29, U.S.C.A. § 213(a) (2)?

█ It appears to be undisputed that the plaintiff comes within Sections 206 and 207 and that the nature of the warehouse operation in and of itself comes within traditional concepts of "interstate commerce." Nor could it be disputed. See Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Wirtz v. First State Abstract and Insurance Company, 362 F.2d 83 (8th Cir.).

---

1. See attached Appendix for sales in all categories.

Turning now to the principal issue of the case, this Court finds that Section 213(a) (2) does not bar recovery. There is no question that the retail facets of the business of Carroll Gas Company meet the percentage requirements of Section 213(a) (2). But Carroll Gas Company consists of two establishments, one of which is exempt and one of which is not exempt.

Section 213(a) (2) reads as follows:

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to— * * *

(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, if such establishment * * *

(iv) is in such an enterprise and has an annual dollar volume of sales (exclusive of excise taxes at the retail level which are separately stated) which is less than $250,000.

A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry".

The Congressional mandate of policy found in Title 29 U.S.C.A., § 202, declares:

"The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard cf living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce."

It is well settled that an employer seeking to exempt his employees under Section 213(a) (2) has the burden of proving "plainly and unmistakenly" that his employees are exempt and that the provisions of the exemption statute are to be narrowly construed. See Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); Walling v. General Industries Co., 330 U.S. 545, 67 S.Ct. 883, 91 L.Ed. 1088 (1947); A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945); Mitchell v. Kroger Company, 248 F.2d 935 (8th Cir.). It should be recognized that the nature and character of the employer's business is the controlling feature under Sections 213(a) (2), (3), and (4). Mitchell v. Kroger Company, supra; Title 29 C.F. R., Section 779.302 (Supp.1966).

It is argued that the Administrator's Interpretative Bulletin, Title 29 C.F.R., Section 779.305 (Supp.1966) brings plaintiff under the retail exemption of Section 213(a) (2) in that Carroll Gas Company is one establishment. Section 779.305 provides:

" * * * the retail portion of an establishment would be considered a separate establishment from the unrelated portion for the purpose of the exemption if (a) it is physically separated from the other activities; and (b) it is functionally operated as a separate unit having separate records and separate bookkeeping; and (c) there is no interchange of employees between the units. The requirement that there be no interchange of employees between the units does not mean that an employee of one unit may not occasionally, when circumstances require it, render some help in the other units or that one employee of one unit may not be transferred to work in the other unit. The re-

quirement has reference to the indiscriminate use of the employee in both units without regard to the segregated functions of such units."

Interpretative Bulletins are to be accorded weight but are not controlling. Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); Mitchell v. Kroger Company, supra.

In Mitchell v. Bekins Van & Storage Company, 231 F.2d 25 (9th Cir.), an action was brought to recover overtime pay for the employees of one warehouse. The Court was faced with the question of whether five warehouses, including the one for whose employees recovery was sought, could be considered one establishment. The one warehouse standing alone could not fulfill the requirements of Section 213(a) (2). The activities of the other four warehouses were primarily local and intrastate. If the five warehouses were considered as one establishment, then the employees of the warehouse were exempt from the Act. Common records and a common bank account were kept for the East Los Angeles Division. Further the Court quoted at p. 31:

"The working force at the East Los Angeles Division is largely interchangeable among the various operating tasks: Most of the drivers are competent as packers and craters and most of the packers and craters are competent as drivers or helpers on moving jobs. These employees are frequently shifted back and forth from one warehouse to another within the East Los Angeles Division; for example, one or more employees are shifted to Alameda on an average of one day per week and one or more employees are shifted from Alameda to another warehouse in the East Los Angeles Division on an average of two days per week."

The Court held that the East Los Angeles Division was one establishment, and, therefore, its employees were exempt. In its view the physical separation of the warehouses was not of importance. The five warehouses were one division and:

"To this court, an important factor here is that if it were not for financial or capital problems and the necessity of using what one has, it would be quite feasible to conduct, and Bekins probably would conduct, the business of the five warehouses in one central warehouse under one roof." Ibid at p. 27.

The Supreme Court, in a summary fashion, reversed the decision in 352 U.S. 1027, 77 S.Ct. 593, 1 L.Ed.2d 589 (1957). In so doing it said that:

"Respondent's five physically separated warehouses do not constitute a single 'retail establishment' within the meaning of the exemption provided by § 213(a) (2) of the Fair Labor Standards Act * * *."

Mitchell v. Birkett, 286 F.2d 474 (8th Cir.) involved a photo shop located at Fort Smith, Arkansas, and a photography concession stand at Camp Chaffee, Arkansas, located nine miles east of Fort Smith. The Fort Smith store finished photos for the Camp Chaffee concession and processed film for Fort Smith customers. It also did similar work for some fifty drug stores including some stores in Oklahoma. The crux issue was whether the Fort Smith shop and the Camp Chaffee concession were one establishment. The Court held they were not. At p. 478, the Court related: "Common ownership and close functional and economic relationship between physically separated units of a business are not sufficient to make such combined units a single establishment * * *." The Court criticized Mitchell v. T. F. Taylor Fertilizer Works, 233 F.2d 284 (5th Cir.), for discounting the importance of the physical separateness principle. The Court in *Taylor Fertilizer* at p. 286 related that:

" * * * the suggestion that the right to an exemption depends upon such factors as whether part of the business is separated by a partition, or is con-

ducted in an adjoining building, or in a building across the street or five blocks away, does not recommend itself as a rational distinction * * *."

■ Carroll Gas Company is owned by Northern Propane. The warehouse is physically separate as it is in two back rooms. See McComb v. Wyandotte Furniture Co., 8 Cir., 169 F.2d 766. No evidence was introduced as to where the sales of appliances by Carroll Gas Company take place. Further, there is no evidence they were pre-ordered for specific customers. As it will be recalled, the burden rests upon the employer to establish the exemption. The inference is that such sales did not take place in the warehouse area. It was testified there was inadequate space in the two back rooms and the shifting of appliances was necessary from time to time. It is common knowledge that retail sales generally do not take place in warehouses.

In addition, this Court deems the present case to be on all fours with the case of Phillips, Inc. v. Walling, supra. In that case, Phillips operated 49 retail grocery stores within a 35 mile radius of Springfield, Massachusetts, 40 of which were in Massachusetts and 9 of which were in Connecticut. A separate warehouse and office building was maintained in Springfield. Nearly all of the merchandise handled in the warehouse came from sources outside of Massachusetts. 80% of the total dollar volume of sales of the warehoused goods was derived from Massachusetts and 18% from Connecticut.

What has been said about physical separateness applied in Phillips. But the Supreme Court emphasized that the chain store system of today has substituted its own warehouses for the independent wholesalers which historically handled the intermediary step in the distribution of goods. The hybrid wholesale and retail nature of the chain store system, and the central warehouse and office as vital factors in the integration of wholesale and retail functions was not found to bring the employees of the warehouse and central office within the exemption.

The Phillips case is manifestly controlling upon the case at hand. Here we have a large system dealing in propane gas and appliances. Its system of distribution of appliances appears to be analogous to that used by Phillips Company. Carroll Gas Company's warehousing operation is a vital link in the process of distribution to Northern Propane affiliates. The fact that Carroll Gas Company was the recipient of some of the appliances stored in the warehouse makes no difference. It was said in Mitchell v. Birkett, supra, 286 F.2d at p. 477:

"Taylor Fertilizer is factually distinguishable as there the processing plant served the owner's single retail outlet. Here, the Fort Smith shop, in addition to processing film for the base shop, performed similar services for the Fort Smith shop and for independent drug stores. See and compare Fred Wolferman, Inc. v. Gustafson, 8 Cir., 169 F.2d 759."

■ Further, the exemption contained in Section 213(a) (2) applies literally to those "employed by" the exempt establishment. Under the Act, economic realities rather than technical concepts control terms like "employer," "employee," and "employ." Goldberg v. Whitaker House Cooperative, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947).

In Mitchell v. Kroger Company, supra, auditors were employed by Kroger Company to inspect and audit retail stores in several states. Although their work was carried out in the premises of exempt retail establishments, they were held to be "employed by" the chain system. The Court applied a "practical consideration" test and found that in reality their duties were functionally related to the entire system.

The same is true here. It cannot be said that plaintiff's work was for Carroll

Gas Company, particularly in light of his warehousing duties. The home office in Omaha sent out pay checks, determined working conditions to some extent, and set vacations. There was some evidence that the district managers had some discretion in determination of hours and working conditions, but plaintiff was realistically "employed by" Northern Propane.

The fact that the employees of Carroll Gas Company, including plaintiff, were not employed full time to work in the warehousing operation is likewise insignificant. There was a flexible interchangeability of employees in the *Bekins* case, supra. And even under the purported standard of the Interpretative Bulletin, supra, plaintiff might not be exempt. See Wirtz v. First State Abstract and Insurance Company, 362 F.2d 83 (8th Cir.).

This Court has held that there are two establishments within the meaning of the Act, one exempt and one non-exempt. It is argued that "employees performing an insignificant amount of incidental work or performing work sporadically for the benefit of another establishment of his employer is nevertheless employed by the retail establishment."

This Court views plaintiff's work as regular and continuous as the needs of his employment required. See Wirtz v. First State Abstract and Insurance Company, supra, and citations therein. Plaintiff engaged in the unloading, shifting, and loading of appliances. He unloaded appliances at least four times in 1962, four times in 1963, and one time in 1964. The time cards of plaintiff are ambiguous as to the extent he helped to move appliances but it is noted on the cards that he spent substantial "plant" time. Shifting was necessitated by inadequate space in the two back rooms. He assisted in loading appliances "at least every week." He also delivered some appliances to other dealers. It cannot be said that such activity was isolated or sporadic.

In regard to the damages which plaintiff has suffered, defendant has not succeeded in segregating plaintiff's interstate activities from his intrastate duties. If an employee spends any part of a work-week in covered work, he is covered for such period. Administrative Interpretative Bulletin 29 C.F.R., Section 776.4 (Supp.1966). It may be that the entire amount of an employee's compensation must conform to the Act when any part of an employee's duties are interstate. *Wirtz,* supra. But if segregation is allowable, the burden is upon the employer to do so. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); *Wirtz,* supra; Hagan v. Goldberg, 291 F.2d 249 (9th Cir.); Mitchell v. Owen, 292 F.2d 71 (6th Cir.).

Viewing only the time for which plaintiff will be entitled to compensation, he helped unload appliances on March 30, 1963, April 23, 1963, July 26, 1963, and March 3, 1964. He loaded appliances "at least every week." He shifted appliances around in the warehouse on some occasions as there was inadequate storage space and cramped facilities. The time cards are somewhat ambiguous upon how his time was spent. He was engaged in "plant" work on numerous occasions. It was estimated that approximately 80% of plaintiff's time was taken up by his capacity of "cylinder driver." However, this fact does not tell us anything as to when plaintiff was engaged in warehousing activities and when he was not. Also, this estimate appears high from all of the evidence.

Part of plaintiff's claim for overtime wages is barred by the statute of limitations. 29 U.S.C.A. §§ 255(a) and 216(c). Plaintiff claims overtime from July 21, 1962 to June 6, 1964. Plaintiff's complaint was filed February 8, 1965. Any overtime for work-weeks accruing prior to February 9, 1963 are barred by the two-year statute of limitations. Mitchell v. Lancaster Milk, 185 F.Supp. 66 (D.Pa.).

Evidence was introduced as to the amount of compensation to which plaintiff is entitled. Plaintiff generally worked a six-day week. His salary through November 16, 1963, was $400.00 a month. On that date and for the remaining period for which damages are claimed, his salary was $425.00 a month. There were no fixed hours and many times the employees of Carroll Gas Company worked more than 40 hours a week. Time slips were kept by the employees which show the hours and days worked by employees during their regular hours. There is a conflict of testimony as to their accuracy.

Anderson v. Mt. Clemens Pottery Co., supra, provides the rules delineating the burden of proof as to the hours for which plaintiff claims overtime wages. The records in this case appear to be accurately and adequately kept as to the number of regular hours and days which plaintiff worked. There are numerous instances in which plaintiff's overtime is shown by time slips turned in to Carroll Gas Company. It was testified by the manager of Carroll Gas Company at that time that the time cards were necessary to charge customers for material and labor, and, for example, to show when an employee was off work. Mr. Langley testified that he suggested the time cards be kept. This Court will not go behind these business records.

■ However, a different matter is presented as to certain time which plaintiff worked after hours. Plaintiff's number was listed in the Carroll telephone books for 1962 and 1963 and for other years for after hours calls. He performed service work and made bottle gas deliveries after hours. No records of after hours calls were kept for the time for which he will be entitled to compensation. Only tickets which were for parts and propane were turned in to the Company. It was testified that it was plaintiff's responsibility to make out time slips and Mr. Langley testified that he told plaintiff to put the hours down. However, the defendant had the duty to keep proper records of the plaintiff's aft-er hours work under Section 11(c) of the Act. See Anderson, supra. The reason it failed to keep records was because it did not charge for the service calls other than for parts and propane provided.

■ The Court has calculated the amount of overtime due plaintiff from February 11, 1963, through June 6, 1964, according to the formula provided in the Administrator's Interpretative Bulletin, 29 C.F.R., Sections 778.113 and 778.114. The total for 267½ hours of listed overtime is $802.57. Extra pay given to plaintiff due to work on five or six days off (call-back) and one week's vacation work in 1963 has not been included in the calculation of the amount of overtime as the Court is unable to ascertain how much was given plaintiff for the extra work. The stipulation is based on the regular six day week. As to the amount of overtime due to after hours calls, plaintiff need merely show that he has in fact performed services for which he was improperly compensated and must produce sufficient evidence to show the amount and extent of the work as a matter of just and reasonable inference. The burden then shifts to the employer to show the precise amount of work performed or to negative the reasonableness of the employee's inference.

■ Plaintiff succeeded in proving the fact that there were probably hours after his regular duties for which he was improperly compensated but he failed to introduce any evidence of the extent thereof by any inference. The only evidence offered was that plaintiff was called on nights, weekends and holidays. He did not keep track of the days or hours these services were performed. No evidence was offered as to the number of times he was called or the hours consumed by this work. The Court cannot engage in pure speculation. No overtime will be allowed for a six-week period from December 23, 1963 through January 25, 1964, as there are no time slips proving plaintiff worked during that period. This Court has accepted the records as reliable.

Accordingly, it will be ordered that plaintiff have judgment against the defendant in the amount of $802.57 and further liquidated damages in the sum of $802.57.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and Order for judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.

## APPENDIX

The dollar sales volumes of the Carroll Gas Company for the years 1962, 1963 and 1964 are as follows:

### 1962 Sales ($)

|  | Retail | Wholesale | Total |
|---|---|---|---|
| Propane | 111,960 | 4,095 | 116,055 |
| Appliances | 41,312 | 2,581 | 43,893 |
| *Other | 21,285 | – | 21,285 |
|  | 174,557 | 6,676 | 181,233 |

### 1963 Sales ($)

|  | Retail | Wholesale | Total |
|---|---|---|---|
| Propane | 124,810 | 3,626 | 128,436 |
| Appliances | 38,587 | 1,156 | 39,743 |
| *Other | 20,251 | — | 20,251 |
|  | 183,648 | 4,782 | 188,430 |

### 1964 Sales ($)

|  | Retail | Wholesale | Total |
|---|---|---|---|
| Propane | 136,223 | 3,100 | 139,323 |
| Appliances | 34,420 | – | 34,420 |
| *Other | 23,329 | – | 23,329 |
|  | 193,972 | 3,100 | 197,072 |

*Note:

Other revenues consist of rent and lease fees, sales of installation materials and labor charges.

Wholesale sales during this period are accounted for by:

(a) One (1) cylinder dealer

(b) Sales of furnaces to a local sheet metal and installation firm.

(c) Sales of propane to a local service station.

Retail sales are those made to the ultimate consumer, as distinguished from sales made for resale.

Retail sales of propane and propane appliances and the servicing and delivery of propane and propane appliances by the defendant are recognized as retail sales or services in the industry.